Receipt number AUSFCC-8511980

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **NICK BASSEN, ISAAC DAILEY, ANDREW MERJIL, PAUL RODRIGUEZ, HUNTER SPRINGER, and DERRICK WYNNE, individually and on behalf of all others similarly situated,**<br><br>  *Plaintiffs*,<br><br>    **v.**<br><br>**THE UNITED STATES OF AMERICA,**<br>  *Defendant*. | Case No. _____   23-211 C |

## CLASS ACTION COMPLAINT

Plaintiffs Nick Bassen, Isaac Daily, Andrew Merjil, Paul Rodriguez, Hunter Springer, and Derrick Wynne, on behalf of themselves and a class of similarly situated persons, bring this class action against Defendant United States of America (the "Government") and allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon reasonable information and belief, including investigation conducted by their attorneys.

### NATURE OF THE CASE

1.  This is a military class action for backpay along with necessary ancillary relief for reinstatement, and/or points, and other relief for current and former members of the Air Force, Army, Navy, Marine Corps and Space Force ("Armed Services") on active duty ("Active-Duty Service Members") who were discharged, constructively discharged, and/or separated, and denied pay and benefits as a consequence of not being "fully vaccinated" pursuant to Department of Defense ("DoD") Secretary Lloyd Austin, III's unlawful August 24, 2021 COVID-19 vaccine mandate and subsequent orders

implementing the mandate ("DoD Mandate"). *See* Ex. 1, Aug. 24, 2021 SECDEF Mandate Memo.

2.      On December 23, 2022, the DoD Mandate was "rescind[ed]" by act of Congress. Section 525 of the FY2023 National Defense Authorization Act (the "2023 NDAA") was enacted into law by veto-proof majorities in the House of Representatives (350-80) and the Senate (83-11). Congress expressly chose the term "rescind", rather than more customary language such as "repeal", "amend", or "clarify", to direct the DoD and the courts that the rescission should be applied retroactively to render the DoD Mandate null and void *ab initio*; to eliminate any legal basis or authority for discharge, constructive discharge, separation, or the denial of pay and benefits; and to restore all adversely affected Active-Duty Service Members to the position they would have been in the absence of the unlawful mandate and the unlawful denial of pay and benefits.

3.      On January 10, 2023, Secretary Austin issued a memorandum rescinding the August 24, 2021 DoD Mandate. *See* Ex. 2, Jan. 10, 2023 Rescission Memo. In the Rescission Memo, Secretary Austin acknowledged the Congressional directive to apply the Rescission retroactively by, among other things, committing to correct all of the paperwork and adverse personnel actions resulting from non-compliance with the now voided DoD Mandate and orders issued pursuant to it.

4.      The rescission of the DoD Mandate in Section 525 of the 2023 NDAA, along with the FY2023 Omnibus Appropriations Bill funding the 2023 NDAA, makes the 2023 NDAA a "money mandating" statute within the meaning of the Tucker Act and provides Plaintiffs and Class members a substantive right to monetary compensation for backpay and other monetary damages and compensation.

5.     The class consists of all Active-Duty Service Members ("Rescission Class") who were discharged, constructively discharged, and/or separated due to their unvaccinated status, and as a result lost pay, benefits, retirement points, training, promotion, or any other emoluments ("Backpay") to which they are entitled under the 2023 NDAA and 37 U.S.C. § 204.

6.     Plaintiffs and members of the Rescission Class have an unconditional right to payment, irrespective of whether the DoD Mandate is deemed to be unlawful, resulting in wrongful discharge and unlawful denial of pay or benefits, or merely a legal nullity. With Congress' rescission, Rescission Class members are entitled to backpay regardless of the right or wrong of the mandate.

7.     In the alternative, all members of the Rescission Class have claims to Backpay under 37 U.S.C. § 204 for wrongful Discharge, denial of pay and benefits, or for constructive service due to the DoD's unlawful actions, to include: (a) mandating mRNA gene therapy products that are not a vaccine as defined by the DoD's controlling regulation, *see* DoD Instruction 6205.02, *DoD Immunization Program*, App. G (July 23, 2019) ("DoDI 6205.02"); or (2) the mandate of Emergency Use Authorization ("EUA") only products in violation of Congress' explicit statutory prohibition in 10 U.S.C §1107a, because the DoD did not have any products licensed by the Food and Drug Administration ("FDA") (*i.e.*, COMIRNATY® and SPIKEVAX®) while the DoD Mandate was in effect.

8.     This alternative class of wrongfully discharged Active-Duty Service Members ("Wrongfully Discharged Class") is co-extensive with the Rescission Class because each member of the Rescission Class was unlawfully ordered to take a non-vaccine, unlicensed/EUA, and unavailable COVID-19 treatment. Each member of the Rescission Class was wrongfully Discharged and denied pay and benefits due to non-

compliance with this unlawful order, compliance with which was in any case impossible due to the unavailability of FDA-licensed vaccines.

9.     The Wrongfully Discharged Class also includes all Active-Duty Service Members whose religious accommodation requests ("RARs") ("Religious Accommodation Sub-Class") for the DoD Mandate were unlawfully denied in violation of the Religious Freedom Restoration Act ("RFRA"), the First Amendment's Free Exercise Clause, DoD Instruction 1300.17, and the Armed Services' RAR regulations. Several federal district courts have found that the Armed Services' RAR processes, which resulted in approval rates of 0.00% to at most 1%, were mere "theater," and four of the six Armed Services have been enjoined on a service-wide basis (Air Force/Space Force, Navy, Marine Corps), while there are multiple pending class actions for the remaining two (Army and Coast Guard). This includes several Plaintiffs and several thousand members of the Rescission Class and the Wrongfully Discharged Class.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction under the Tucker Act, 28 U.S.C. §1491(a). The Tucker Act provides, in relevant part, as follows:

(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or *any Act of Congress* or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.

11.     Plaintiffs' and the Class members' claims against Defendant are founded upon either, or both, a money mandating Act of Congress and/or executive department regulations, including: (a) the 2023 NDAA, Section 525 thereof, and the FY2023 Omnibus Appropriations Bill funding the 2023 NDAA; (b) the Military Pay Act, 37 U.S.C. § 204; (c) the military retirement pay statutes, 10 U.S.C. §1370 and §1370a; and (d) DoD and Armed Services'  implementing regulations, including DoD Financial Management Regulation ("FMR") 7000.14-R, Vol. 07a.

12.     The aforementioned statutes and regulations constitute an express waiver of the sovereign immunity of the United States of America and can fairly be interpreted as mandating compensation by the Government for damages sustained and/or creating a substantive cause of action and/or right to recover money damages against the Government.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1491(a)(1).

## PARTIES

14.     Plaintiff Nicholas Bassen is a Sergeant ("SGT") in the Army with six years of service. On October 3, 2022, SGT Bassen was involuntarily discharged due to his unvaccinated status and the DoD Mandate prior to the expiration of his enlistment contract on October 15, 2024. He seeks backpay and other financial compensation of at least $120,000, restoration of medical benefits, retirement points, correction of records, and cessation of signing bonus repayment.

15.     Isaac Dailey is a Specialist ("SPC") in the Army with 1 year, 9 months of service. On June 21, 2022, SPC Isaac was involuntarily discharged due to his unvaccinated status and the DoD Mandate prior to the expiration of his enlistment contract on August

24, 2025. He seeks backpay and other financial compensation of at least $150,000, restoration of retirement points, correction of records, and any other appropriate relief.

16.    Plaintiff Adam Merjil is a Specialist in the Army with 2 years of service. On May 27, 2022, SPC Merjil was involuntarily discharged due to his unvaccinated status and the DoD Mandate prior to the expiration of his enlistment contract on May 22, 2025. He seeks backpay and other financial compensation of at least $50,000, restoration of retirement points, correction of records, and any other appropriate relief.

17.    Plaintiff Paul Rodriguez is a Technical Sergeant ("TSGT") in the Air Force with ten years of service. On September 6, 2022, TSGT Rodriguez was involuntarily discharged due to his unvaccinated status and the DoD Mandate prior to the expiration of his enlistment contract in March 2024. TSGT Rodriguez submitted an initial RAR, which was denied on April 4, 2022, and his RAR appeal was denied on May 9, 2022. He seeks backpay and other financial compensation in excess of $100,000 restoration of retirement points, correction of records, and any other appropriate relief.

18.    Plaintiff Hunter Springer is a Private First Class ("PFC") in the Marine Corps with one year of service. On February 9, 2022 PFC Springer was involuntarily discharged due to his unvaccinated status and the DoD Mandate prior to the expiration of his enlistment contract on July 26, 2026. He seeks back pay and other financial compensation of at least $100,000, restoration of retirement points, correction of records, and any other appropriate relief.

19.    Plaintiff Derrick Wynne is a Private First Class in the Army with two years of service. On June, 28 2022, PFC Wynne was involuntarily discharged due to his unvaccinated status and the DoD Mandate prior to the expiration of his enlistment contract on February 9, 2025. Plaintiff seeks back pay and other financial compensation

of at least $90,000, restoration of retirement points, correction of records, and any other appropriate relief.

20.     Defendant is the United States of America (the "Government"), a sovereign entity and body politic. Defendant is responsible for the actions of its various agencies, including, the DoD and all its components, the Department of the Air Force ("Air Force"), the Department of the Army ("Army"), and the Department of the Navy ("Navy") (collectively, "Defendant Agencies").

## STATEMENT OF FACTS

### I.      DOD COVID-19 MANDATE AND RESCISSION

#### A.      DoD COVID-19 Vaccine Mandate

21.     On August 24, 2021, Secretary of Defense Lloyd Austin III issued the DoD Mandate, directing the Secretaries of the Military Departments "to immediately begin full vaccination of all members of the Armed Forces … or in the Ready Reserve, including the National Guard, who are not fully vaccinated against COVID-19." Ex. 1, Aug. 24, 2021 SECDEF Mandate Memo, at 1. The SECDEF directed that mandatory vaccination "will only use COVID-19 vaccines that receive full licensure from the [FDA], in accordance with FDA labeling and guidance." *Id.*

#### B.      Armed Services Mandates

22.     Each of the Armed Services issued their own mandates shortly after the issuance of the DOD Mandate. *See* Ex. 3, Dept. of the Air Force, *COVID-19 Mandatory Vaccination Implementation Guidance for Service Members* (Sept. 3, 2021) (Air Force Mandate); Ex. 4, Dept. of the Army, HQDA EXORD 225-21 (FRAGO 35) COVID-19 STEADY STATE OPERATIONS (Sept. 14, 2021) (Army Mandate); Ex. 5, U.S. Marine Corps MARADMIN 462/21 (Sept. 1, 2021) (Marine Corps Mandate); Ex. 6, Dept. of the

Navy, ALNAV 190/21, *Navy Mandatory COVID-19 Vaccination and Reporting Policy* (Sept. 1, 2021) (Navy Mandate). Each of the Armed Services have issued subsequent orders implementing and modifying the initial Armed Services Mandates.

### C.    Impact on Military Readiness, Retention and Recruiting

23.    Nearly 8,500 service members have been discharged for non-compliance with the DoD Mandate, including 1,841 Army Soldiers, 3,717 Marines, 834 airmen and 2,041 Navy sailors. *See* Caitlin Doornbos, *Pentagon Ends COVID-19 Vaccine Mandate for US Troops* NY Post (Jan. 11, 2023), available at: https://nypost.com/2023/01/11/pentagon-ends-covid-19-vaccine-mandate-for-us-troops/ (last accessed Jan. 11, 2023). This estimate does not include Active-Duty Members who have been constructively discharged or involuntarily placed into the IRR, so the number of Rescission Class and Wrongfully Discharged Class members is likely multiple times larger.

24.    On September 15, 2022, over 50 Members of Congress wrote to Secretary Austin to express "grave concern of the effect of the" DOD Mandate because, "[a]s a major land war rages in Europe our own military faces a self-imposed readiness crisis." Ex. 7, Sept. 15, 2022 Congressional Letter to Secretary Austin, at 1. In their view, the DOD "has abused the trust and good faith or loyal servicemembers by handling exemptions in a sluggish and disingenuous manner," making many wait "for nearly a year to learn if they will be forcibly discharged for their sincerely held religious beliefs or medical concerns." *Id.* at 2. They identify the DOD Mandate as the "primary cause of the [DOD]'s recruiting difficulties," which will result in the loss of at least 75,000 from the Army alone, *id.* at 2, and effectively "disqualifies more than forty percent of the Army's target demographic

from service nationwide, and over half of the individuals in the most fertile recruiting grounds." *Id.* at 2.

### D.    DoD Mandate Rescission

25.    On December 23, 2022, President Biden signed into law the 2023 NDAA, which was enacted by a vote of 83-11 in the Senate and 350-80 in the House. Section 525 of the 2023 NDAA directed Secretary of Defense Lloyd Austin, III to "rescind" the August 24, 2021 DoD Mandate. H.R. 7776, Pub. L. No. 117-263, 136 Stat. 2395 (2022).

26.    Congress intentionally used the term "rescind", rather than "repeal", to instruct Secretary Austin and the courts that Section 525 must be applied retroactively. "Rescind" is derived from the Latin "rescission", which means "an annulling; avoiding, or making void; abrogation; rescission". BLACK'S LAW DICTIONARY at 1306 (6th ed. 1990). It is normally used in the context of "rescission of contract", which means to "abrogate, annul, avoid or cancel a contract;" "void in its inception"; or "an undoing of it from the beginning." *Id.* "Rescind" thus necessarily has retroactive effect and renders the rescinded contract, policy or rule void *ab initio*. Section 525 thus reflects the determination by veto-proof majorities of Congress that Secretary Austin's Mandate was void *ab initio*. Consequently, all adverse personnel actions and denial of pay and benefits taken as a result of non-compliance with an order that is now a legal nullity must be undone from the beginning and corrected.

27.    Section 525 and its retroactive effect further demonstrates Congress' intended that both 2023 NDAA and the 2022 NDAA, along with the corresponding appropriations acts, are "money-mandating" statutes. Both the 2022 NDAA and 2023 NDAA included full funding for pay, training, benefits, points and other financial compensation for all members of the Rescission Class for all of FY2022 and FY2023. The

Section 525 Rescission removed any legal basis for Secretary Austin or the Defendant Agencies to withhold any such funding or compensation for non-compliance with a directive that has been rescinded. Similarly, the 2023 NDAA does not include any funding offsets to reflect the reduction in funding resulting from Secretary Austin's directive and subsequent discharges, placement into inactive status, resulting therefrom for the members of the Rescission Class.

> ### E.      Rescission Implementation by Defendant Agencies

28.     On January 10, 2023, Secretary Austin rescinded the August 24, 2021 DoD Mandate. *See* Ex. 2, SECDEF Rescission Memo. In the Rescission Memo, Secretary Austin acknowledged that Section 525 applies retroactively by ordering that all separations and discharges resulting solely from non-compliance with the DoD Mandate should be halted and that all adverse personnel actions and paperwork should be corrected. *Id.* at 1. Secretary Austin further directed the Service Secretaries to cease adjudication of RARs and medical or administrative exemptions. *Id.*

29.     Each of the Armed Services has issued orders rescinding that Service's mandate. *See* Ex. 8, Dept. of the Air Force, *Rescission of 3 September 2021 Mandatory Coronavirus Disease Vaccination Memorandum* (Jan. 23, 2023); Ex. 9, Dept. of the Army, HQDA EXORD 225-21 (FRAGO 35) COVID-19 STEADY STATE OPERATIONS (Dec. 30, 2022); Ex. 10, U.S. Marine Corps, MARADMINS 025/23, *Rescission of COVID-19 Vaccination Requirement* (Jan. 18, 2023); Ex. 11, Dept of the Navy, NAVADMIN 005/23, *Removal of COVID-19 Vaccination Mandate* (Jan. 11, 2023).

30.     The Defendant Agencies' implementing orders do not require reinstatement of discharged members or provide backpay or other financial compensation for discharged members.

### F.      Backpay and Other Compensation Required by Rescission

31.      Pursuant to the 2023 NDAA rescission, Plaintiffs seek backpay and financial compensation for being discharged, constructively discharged, and/or separated for non-compliance with the now rescinded mandate and to be restored to the position in which they would have been absent the mandate.

32.      Secretary Austin's creation of a new requirement for service in the U.S. military (the Covid-19 mRNA gene therapy vaccines) resulted in record losses in retention, shortfalls in recruiting, as noted ¶ 23 *supra*, and also a financial windfall for DoD by keeping money that had previously been appropriated for Plaintiffs and Class Members in prior fiscal year defense authorizations and the 2023 NDAA.

33.      Congress' rescission creates no new financial outlay, but rather restores the Total Force to troop levels for which Congress has already budgeted by its unequivocal removal of the barrier to - and payment for - service in the armed forces that Secretary Austin's actions created.

## II.     PREVIOUS MANDATES AND INFORMED CONSENT LAWS

### A.      This Is Not the First Vaccine Rodeo for the Services or Congress.

34.      The DoD and the other Armed Services have, for nearly a century, used service members for medical experiments and experimental drugs. *See, e.g.*, Dale Saran, *United States v. Members of the Armed Forces*, at 9-29 (2d ed., 2021). In response to these abuses, Congress has repeatedly exercised its plenary authority under Article I, Section 8, clauses 12-14 of the U.S. Constitution, to regulate the Armed Services to protect service members from these experiments; to recognize their human rights to informed consent; and to prohibit the military from ordering or mandating them to participate in medical experiments or to take experimental treatments.

35.     Prior to the first Gulf War, the DoD sought to pretreat service members with several unlicensed, "investigational" new drugs, including pyridostigmine bromine and a botulinum toxoid vaccine, which under U.S. law could not be administered to military members without informed consent. The DOD successfully petitioned the FDA to establish a new rule waiving U.S. servicemembers right to informed consent. In numerous hearings in the aftermath of the Gulf War, the administration of these experimental drugs has been correlated with "Gulf War Illness" or "Gulf War Syndrome," which "debilitated over 174,000 service members." *See generally* Efthimios Parasidis, *Justice and Beneficence in Military Medicine and Research*, 73 Ohio St. L.J. 723, 732-39 & 759-60 (2012).

36.     After extensive hearings in Congress across multiple committees documenting systemic, repeated failures by the DOD involving the health of America's all-volunteer force, including the ill-fated and disastrous anthrax vaccine, the U.S. Congress passed Title 10 U.S.C. §1107 in 1997. This statute requires that, in any instance in which the DOD sought to use any unlicensed, *investigational* product on members of the Armed Forces, no one short of the Commander-in-Chief could waive a servicemember's right to informed consent.

37.     In the following years, as the anthrax vaccine program remained mired in failed FDA inspections and controversy, Congress continued to hold hearings on the subject and strengthened 10 U.S.C. §1107's protections and requirements for both the Secretary of Defense and Commander-in-Chief. *Compare* 10 U.S.C. §1107 (1997) *with* 10 U.S.C. §1107 (2000). *See also* 144 Cong. Rec. H. 4616 (June 16, 1998).

38.     In 2003, the district court for the District of Columbia issued a preliminary injunction against the DoD for their violations of that statute, and in 2004 that same court

issued a permanent nation-wide injunction prohibiting the DoD's anthrax vaccine mandate. *See Doe v. Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003)("*Rumsfeld I*") (preliminary injunction), *modified sub nom. John Doe No. 1 v Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004) ("*Rumsfeld II*") (permanent injunction), *modified sub nom. John Doe No. 1 v. Rumsfeld*, 2005 WL 774857 (D.D.C. Feb. 6, 2005) ("*Rumsfeld III*") (modified permanent injunction to cover EUA products).

39. In the middle of that litigation in 2004, and in part as a result of the anthrax letter attacks that occurred the week after 9/11, Congress passed the Project BioShield Act, the first version of the current EUA statute, 21 U.S.C. §360bbb-3. Shortly thereafter, Congress also passed another mirror image statute for the protection for servicemembers' informed consent rights applicable to the EUA statute, 10 U.S.C. §1107a.

40. Much like its predecessor statute that was passed in 1997, 10 U.S.C. §1107a states in pertinent part:

> (a) Waiver by the President —
>
> (1) In the case of the administration of a product authorized for emergency use under section 564 of the Federal Food, Drug, and Cosmetic Act to members of the armed forces, the condition described in section 564(e)(1)(A)(ii)(III) of such Act and required under paragraph (1)(A) or (2)(A) of such section 564(e), designed to ensure that individuals are informed of an option to accept or refuse administration of a product, may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security.

10 U.S.C. § 1107a.

41. After the EUA statute's passage, the FDA granted the first ever Emergency Use Authorization for the anthrax vaccine. Then both the DOD and FDA jointly filed an emergency petition in the D.C. District Court to modify the injunction already in place against the anthrax vaccine program in order to allow the vaccine to be administered to

servicemembers solely on a *voluntary basis* in *Rumsfeld III*. *See Rumsfeld III*, 2005 WL 774857, at *1 ("ORDERED that the Court's injunction of October 27, 2004, is modified by the addition of the following language: 'This injunction, however, shall not preclude defendants from administering AVA, on a *voluntary* basis, pursuant to the terms of a *lawful* emergency use authorization ("EUA")[.]'")(emphasis in original). *See also* FDA, *Authorization of Emergency Use of Anthrax Vaccine Adsorbed for Prevention of Inhalation Anthrax by Individuals at Heightened Risk of Exposure Due to Attack With Anthrax; Availability*, 70 Fed. Reg. 5452, 5455 (Feb. 2, 2005) (Section IV "Conditions of Authorization").

42.     In 2008, the DoD issued DoD Instruction 6200.02 ("DoDI 6200.02") the currently effective regulation governing the mandate of EUA products. Consistent with the EUA statute, 10 U.S.C. § 1107a, and the nation-wide consent decree in *Rumsfeld III*, the instruction requires that the DoD include an option to refuse an EUA product.

> E3.3 <u>Implementation of EUA</u>. DoD Components using medical products under an EUA shall comply with all requirements of section 564 of Reference (d), FDA requirements that are established as a condition of granting the EUA (except as provided in section E3.4 concerning a waiver of an option to refuse), guidance from the Secretary of the Army as Lead Component, and instructions from the ASD(HA).

> E3.4. <u>Request to the President to Waive an Option to Refuse</u>. In the event that an EUA granted by the Commissioner of Food and Drugs includes a condition that potential recipients are provided an option to refuse administration of the product, the President may, pursuant to section 1107a of Reference (e), waive the option to refuse for administration of the medical product to members of the armed forces. Such a waiver is allowed if the President determines, in writing, that providing to members of the armed forces an option to refuse is not in the interests of national security. Only the Secretary of Defense may ask the President to grant a waiver of an option to refuse.

DoDI 6200.02, *Application of Food and Drug Administration (FDA) Rules to Department of Defense Force Health Protection Programs*, ¶¶E3.3, 3.4 (Feb. 27, 2008).

43.     DoDI 6205.02 is the extant governing regulation for routine military immunizations. This instruction defines a "vaccine" and "vaccination" as:

> **vaccination**. The administration of a vaccine to an individual for inducing *immunity*.

> **vaccine.** A preparation that [1] contains one or more components of a **biological agent** or toxin ***and*** [2] induces a protective immune response **against that agent** when administered to an individual.

DoDI 6205.02, ¶ G.2 ("Definitions") (emphasis added).

44.     Army Regulation 40-562 "Immunization and Chemoprophylaxis for the Prevention of Infectious Diseases" (AR 40-562)[1] implements and complements DoDI 6205.02. The list of required vaccines for members of the military is found in App. D.  AR 40-562 was signed on Oct. 7, 2013, went into effect on Nov. 7, 2013, and remains in effect today. It applies to all branches of the military. The Regulation also applies whether the proposed COVID-19 vaccines Defendant DoD seeks to administer to Plaintiffs and the class are "Investigational New Drugs" as defined in 21 CFR 56.104(c) ("IND"), an EUA issued under 21 USC § 360bbb-3, or a fully approved FDA vaccine for other illnesses such as chicken pox, measles, or mumps, for example.

### B.     Not Enough Guinea Pigs; From Volunteer to Volun-Told

45.     In December 2020, after two months of clinical testing, the FDA granted the first EUAs for COVID-19 vaccines developed by Pfizer-BioNTech and Moderna.

46.     In March 2021, March of 2021, members of Congress sent a memorandum to President Biden asking him to invoke 10 U.S.C. §1107a to "waive servicemembers right

---

[1] This document is an all-service publication and has an equivalent name for each of the applicable services. We have chosen to use the Army designation throughout for ease, but these arguments apply equally under AFI 48-110, BUMEDINST 6230.15B, COMDETINST M6230.4G. *See*, AR 40-562, ¶2-6a.(1)(b).

to informed consent" to refuse unlicensed, EUA vaccines because of low voluntary vaccine participation.

> Seven Democratic members of Congress signed the letter, including House Rules Committee Chairman Rep. James McGovern and House Armed Services Committee members Rep. Jimmy Panetta, Rep. Marilyn Strickland, Rep. Sara Jacobs and Rep. Marc Veasey...
>
> The Department of Defense has said publicly that the opt-out rate among service members eligible to be vaccinated is about 33%, but last week military officials and service members CNN spoke with from several bases and units across the country suggest the current rejection rate may be closer to 50%.

See Ellie Kaufman, *Lawmakers ask Biden to issue waiver to make Covid-19 vaccination mandatory for members of military*, CNN (Mar. 24, 2021), available at: https://www.cnn.com/2021/03/24/politics/congress-letter-military-vaccine/index.html (last accessed, Jan. 25, 2023).

### C.    FDA Licensure and Interchangeability Determinations

47.    On August 23, 2021, the FDA approved the Biologic License Application ("BLA") to Pfizer and BioNTech for the original "Purple Cap" formulation of COMIRNATY®. *See* FDA, Aug. 23, 2021 Purple Cap COMIRNATY® BLA Approval Letter at 1-2, available at: https://www.fda.gov/media/151710/download (last accessed Feb. 3, 2022).

48.    Also on August 23, 2021, the FDA re-issued the EUA for the Pfizer COVID-19 vaccine. *See* Ex. 12, Aug. 23, 2021 Pfizer/BioNTech EUA Re-Issuance Letter. This letter stated that the EUA for a different, "legally distinct" mRNA injectable would remain in

place because the licensed product COMIRNATY was "not available... in sufficient quantities" for the eligible population. *Id.* at 5 n.9.[2]

49.    The FDA's August 23, 2021 EUA Re-Issuance Letter also included a footnote claiming that:

> The licensed vaccine [COMIRNATY] has the same formulation as the EUA-authorized vaccine [BNT162b2] and the products can be used interchangeably to provide the vaccination series without presenting any safety or effectiveness concerns. The products are legally distinct with certain differences that do not impact safety or effectiveness.

*Id.* at 2 n.8. This footnote is significant because "interchangeability" is a statutorily defined term in the Public Health Safety Act ("PHSA"). The PHSA requires the manufacturer to separately apply for, and receive, FDA approval to treat a product as interchangeable with another licensed product.[3]

---

[2] In fact, it appears that the Purple Cap COMIRNATY® approved by the FDA was never manufactured or marketed in the United States. The FDA-approved product labeling for Purple Cap COMIRNATY® list its "Marketing Start Date" and "Marketing End Date" both as "23 Aug 2021." *See*, *e.g.*, Archived FDA Approved Labeling and Package Insert for COMIRNATY, available at: https://dailymed.nlm.nih.gov/dailymed/archives/fdaDrugInfo.cfm?archiveid=595377#section-13 (last visited January 25, 2023). On September 13, 2021, Pfizer subsequently confirmed that "it does not plan to produce any product with these new NDCs [*i.e.*, 0069-1000] and labels over the next few months." *See* Sept. 13, 2021 Pfizer Announcement, available at: https://dailymed.nlm.nih.gov/dailymed/dailymed-announcements-details.cfm?date=2021-09-13 (last accessed Feb. 6, 2023). A review of the NIH site confirms that there are no active National Drug Codes ("NDC") for the "Purple Cap" formulation. The referenced package insert was obtained from the NIH labeling archives, and there are no currently effective package inserts for Purple Cap COMIRNATY®.

[3] A biologic product's *interchangeability* with another biologic product is governed by federal statute. 21 U.S.C. § 262(i)(3)("The term 'interchangeable' or 'interchangeability', in reference to a biological product that is shown to meet the standards described in subsection (k)(4), means that the biological product may be substituted for the reference product without the intervention of the health care provider who prescribed the reference product."). Subsection (k)(4) is just one among a long list of requirements under Section 262(k) that must be met before any "biologic product" can be deemed "bioequivalent" to, and thus "interchangeable with," an already licensed "reference product," including terms of years of exclusivity for the reference product itself. *See* 42 U.S.C. §§ 262(k)(6) & (k)(7).

50.     Neither the manufacturers (Pfizer and BioNTech) nor the FDA followed these statutorily mandated requirements to make an "interchangeability" finding or determination. In related litigation, Peter Marks, the Director of the FDA's Center for Biologics Evaluation and Research ("CBER"), has repeatedly acknowledged that the FDA has not made a "statutory" interchangeability determination under the PHSA.

51.     On January 31, 2022, the FDA approved the BLA for Moderna's SPIKEVAX® COVID-19 vaccine. *See* FDA, Jan. 31, 2022 SPIKEVAX® BLA Approval Letter, available at: https://www.fda.gov/media/155815/download (last accessed Feb. 3, 2023).

52.     Also on January 31, 2022, the FDA re-issued the EUA for Moderna's unlicensed COVID-19 vaccine because the FDA-licensed product not available in sufficient quantities. Ex. 13, Jan. 31, 2022 Moderna EUA Re-Issuance Letter. The Moderna EUA letter similarly acknowledged that the FDA-licensed SPIKEVAX® and EUA product were "legally distinct" and asserted that the unlicensed Moderna EUA COVID-19 vaccine "can be used interchangeably" with the FDA-licensed SPIKEVAX®. *See id.*, at 3, fn.9.

### D.    DoD Mandate of Unlicensed EUA Products

53.     On August 24, 2021, Secretary Austin issued the DoD Mandate, *i.e.*, one day after FDA approval of Purple Cap COMIRNATY® and the re-issuance of the EUA for the unlicensed Pfizer/BioNTech COVID-19 vaccine due to the unavailability of the only FDA-licensed product, Purple Cap COMIRNATY®. As explained above, the DoD Mandate stated that mandatory vaccination "will only use COVID-19 vaccines that receive full licensure from the [FDA], in accordance with FDA labeling and guidance." Ex. 1, Aug. 24, 2021 SECDEF Mandate Memo, at 1.

54.    The DoD has admitted in sworn testimony and official records filed in related litigation that the DoD did not have any FDA-licensed COVID-19 vaccines when the DoD Mandate was issued. The DoD has consistently asserted that EUA vaccines may be mandated, and it has admitted it has mandated EUA-labeled vaccines. *See, e.g., Doe #1-#14 v. Austin,* 2021 WL 5816632, at *5 (N.D. Fla. Nov. 12, 2021) (defense counsel for Defendant Agencies admitting that they were "mandating vaccines from EUA-labeled vials").

55.    Because there was no COMINARTY® available, all DoD units began using and mandating the unlicensed, EUA Pfizer/BioNTech COVID-19 vaccine based on the DoD's determination that the EUA vaccine and the licensed vaccine were "interchangeable" and could be mandated.

56.    In a September 14, 2021 Memorandum, a DoD official relied on the FDA's footnote in directing all DoD components to treat the unlicensed, EUA version "as if" it were FDA-licensed and went well beyond the FDA's guidance in asserting that the licensed and unlicensed products are legally interchangeable for the purposes of the mandate.

> Per FDA guidance, these two vaccines are "interchangeable" and DoD health care providers should "use doses distributed under the EUA to administer the vaccination series as if the doses were the licensed vaccine.

> Consistent with FDA guidance, DoD health care providers will use both the Pfizer-BioNTech COVID-19 vaccine and the Comirnaty COVID-19 vaccine interchangeably for the purpose of vaccinating Service members in accordance with Secretary of Defense Memorandum.

Ex. 14, Asst. Secretary of Defense Memorandum "Mandatory Vaccination of Service Members Using the Pfizer-BioNTech COVID-19 and COMIRNATY COVID-19 Vaccines," (Sept. 14, 2021) ("Pfizer Interchangeability Directive").

57.     On May 3, 2022, due to the unavailability of FDA-licensed SPIKEVAX®, the DOD issued the same directive that EUA Moderna COVID-19 vaccines were to be used interchangeably with, and "as if," they were the FDA-licensed and labeled Moderna SPIKEVAX® vaccine. See Ex. 15, May 3, 2022 DOD Memo, at 1 ("Moderna Interchangeability Directive").

58.     Only the FDA has the statutory authority to make a determination of legal interchangeability, which the FDA has expressly disclaimed having done. The Assistant Secretary of Defense for Health Affairs is an employee of the Department of Defense without any authority to declare an unlicensed, EUA biologic product *interchangeable* with an FDA-licensed one, and therefore to make such an EUA product mandatory for members of the military. Even the President cannot do so by three separate and unequivocal acts of Congress. *See* 10 U.S.C. §1107a, 42 U.S.C. §262, and 21 U.S.C. §360bbb-3.

**E.     Plaintiffs and Class Members Have Been Wrongfully Discharged Despite Unavailability of Any FDA-Licensed Vaccines.**

59.     DoD and the Armed Services have consistently misrepresented that they had FDA-licensed COVID-19 vaccines available to service members when they did not and that unlicensed EUA vaccines are legally interchangeable with FDA-licensed vaccines.

60.     Defendants do not currently, and have never had any, FDA-licensed COMIRNATY® COVID-19 vaccines. To the extent that they ever did obtain COMIRNATY® COVID-19 vaccines, (1) they did not obtain sufficient quantities to fully vaccinate all putative class members and (2) these products are misbranded, expired,

and/or adulterated that must be destroyed and cannot be voluntarily administered to anyone, much less mandated to service members.

61.     To the extent that Defendants obtained any SPIKEVAX® COVID-19 vaccines, (1) the products were obtained insufficient quantities to fully vaccinate all putative class members and (2) these products are misbranded, expired, and/or adulterated and cannot be mandated.

62.     In related litigation, the DoD and Armed Services have admitted that they did not have any FDA-licensed vaccines—which they refer to as "Comirnaty-labeled" and "Spikevax-labeled" products—until at the earliest June 2022 for the "Comirnaty-labeled" products and September 2022 at the earliest for "Spikevax-labeled" products. It is therefore undisputed that there were no FDA-licensed vaccines available before those dates and that Defendants were mandating EUA vaccines, in violation of 10 U.S.C. § 1107a, at least through that date.

63.     Investigations by military whistleblowers and filings in related proceedings demonstrate that the nearly 50,000 doses of "Comirnaty-labeled" vaccines were: (1) are in fact unlicensed EUA "monovalent" products misbranded as FDA-licensed because they were not manufactured at an FDA-licensed facility, as required by the PHSA and FDA regulations; (2) are in fact unlicensed, EUA "bivalent" vaccines; and/or (3) are expired or adulterated products that may not be administered, much less mandated, to anyone.

64.     The small number (approx. 770) of SPIKEVAX® doses obtained would have been sufficient to vaccinate a tiny fraction of class members. In any case, all SPIKEVAX® in DoD's possession as of January 23, 2023, has now expired and can no longer be ordered. *See* Ex. 16, Jan. 23, 2023 Defense Health Agency Guidance, at 1.

**F.    Backpay and Other Compensation Due to Wrongful Discharge and Denial of Pay, Benefits, Points, or Training.**

65.    Any Plaintiffs or Class Members who were discharged, constructively discharged, and/or separated, and denied pay, points or benefits, or suffered any other adverse financial consequences necessarily have a claim for backpay under the applicable provisions of the Military Pay Statute, 37 U.S.C. § 204, from the time of the adverse action through the date when the military first made an FDA-licensed product available to them.

66.    Given the unavailability of any FDA-licensed vaccines for the entire period, they are owed backpay and other financial compensation from the date of wrongful discharge or denial of pay, benefits, points, etc., at a minimum through the end of their term of service and any reenlistment for which they would have been eligible in the absence of the DoD Mandate.

## III.    DEFENDANT AGENCIES' RELIGIOUS ACCOMMODATION PROCESS

### A.    The Religious Freedom Restoration Act

67.    RFRA states that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). If the Government substantially burdens a person's exercise of religion, it can do so only if it "demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

68.    The DoD has implemented RFRA through DoD Instruction 1300.17, *Religious Liberty in the Military Services* (Sept. 1, 2020). Each of the Services has implemented RFRA and DoD 1300.17's requirements in their own regulations. *See* Dept. of the Air Force Instruction, 52-501, *Religious Freedom in the Department of the Air*

*Force* (June 23, 2021); Dept. of the Army, Army Regulation 600-20, *Army Command Policy* (July 24, 2020); Dept. of the Navy, MILPERSMAN 1730-020 (Aug. 15, 2020); Dept. of the Navy, BUPERSINST 1730.111A (Navy and Marine Corps).

### B. Defendant Agencies' Sham Religious Accommodation Process

69.     The DoD and Armed Services have implemented a process for religious accommodations that courts have described as a "sham," *Navy SEAL 1 v. Biden,* No. 8:21-cv-2429, 2021 WL 5448970 (M.D. Fla. Nov. 22, 2021), and a "quixotic quest" that amounts to little more than "theater." *Air Force Officer v. Austin*, --- F.Supp.3d ---, 2022 WL 468799, at *1 (M.D. Ga. Feb. 15, 2022) (*quoting Navy SEALs 1-26 v. Austin,* 2022 WL 34443, at *1 (N.D. Tex. Jan. 3, 2022)).

70.     Several district and appellate courts have issued nation-wide injunctions, against four of the six Armed Services (Air Force/Space Force, Navy, Marine Corps), finding a substantial likelihood of success on the merits for Plaintiff service members' RFRA claims.[4] There are several additional pending class actions against the remaining two services, the Army and the Coast Guard.

---

[4] *See Navy SEALs 1-26 v. Austin*, 2022 WL 1025144 (N.D. Tex. Mar. 28, 2022) ("*Navy SEALs 1-26*") (granting class certification and preliminary injunction for Navy members who had submitted RARs); *Doster v. Kendall*, 2022 WL 2760455 (S.D. Ohio July 14, 2022) (granting class certification and class-wide temporary restraining order ("TRO") for Air Force member who submitted an RAR); *Doster v. Kendall*, 2022 WL 2974733 (S.D. Ohio July 27, 2022) (expanding Air Force class-wide TRO to class-wide preliminary injunction), *aff'd*, 2022 WL 17261374 (6th Cir. Nov. 29, 2022) ("*Doster*"); *Colonel Fin. Mgmt. Officer v. Austin*, No. 8:22-CV-1275-SDM-TGW, 2022 WL 364351216 (M.D. Fla. Aug. 18, 2022) ("*CFMO*") (granting class-wide certification and preliminary injunction for Marine Corps members). The proceedings in *CFMO, Doster,* and *Navy SEALs 1-26* are set for summary adjudication and trial in the next few months, and it is likely that these courts will have rendered decisions on the merits of Air Force, Marine Corps and Navy members' RFRA claims to inform this Court's evaluation of Plaintiffs' RFRA claims.

71.     This is because the RAR process for all services and all statuses (active-duty, reserve or National Guard) has resulted in nearly uniform denials of service members requests for religious accommodations, using nearly identical form letters with only names, dates, and titles or duties changed. The Armed Services have denied at least 99% of RARs that have been adjudicated.

72.     The true number likely approaches 100% given that the small number of RARs approved all appear to have been disguised administrative exemptions granted to service members on terminal leave in their final months of service.

73.     All Plaintiffs who have submitted RARs have either had their requests denied, or are still pending and will not be adjudicated pursuant to Secretary Austin's January 10, 2023 Rescission Memorandum.

74.     The DoD's categorical ban on religious accommodations clearly violates RFRA and the Free Exercise Clause, as several courts have found likely occurred, even with the government's opportunity to defend the policy under strict scrutiny.

75.     Section 525's retroactive rescission of the DoD Mandate, however, has eliminated any possibility for the government to even raise a defense. The government no longer has any interest, compelling or otherwise, in systematically denying religious accommodation requests. Further the policy is no longer a permissible means at all for achieving any legitimate policy, much less the least restrictive means.

76.     Accordingly, Plaintiffs need only show that the previous denials of religious liberties substantially burdened their free exercise of religion to shift the burden to the government to justify its policies. Rescission means that Congress has deprived the government of any ability to raise a defense or to justify the now-rescinded policy.

## IV.   CLASS ACTION ALLEGATIONS

### A.   Class Definitions

77.     Plaintiffs bring this action pursuant to Rule 23 of the Rules of the United States Court of Federal Claims ("RCFC") on behalf of themselves and the following alternatively pleaded classes.

78.     The "Rescission Class" consists of all current and former Active-Duty Service Members: (1) who were discharged, constructively discharged, and/or separated due to their unvaccinated status, and as a result lost  pay, benefits, retirement points, training, promotion, or any other emoluments ("Backpay") to which they are entitled under the 2023 NDAA and 37 U.S.C. § 204; or (2) who choose to opt-in to the present action after notice as required by Rule 23 RCFC.

79.     Should the Court not certify the Rescission Class as requested above, then in the alternative, Plaintiffs bring this action on behalf of a "Wrongfully Discharged Class" which is defined in the same manner as the Rescission Class alleged above, except the grounds for class members' claims in the Wrongfully Discharged Class are that: (A) the DoD's Mandate was unlawful as it required class members to take an unlicensed, EUA vaccine, in violation of 10 U.S.C. § 1107a; (B) the DoD Mandate was predicated upon an unlawful order that has been rescinded by the 2023 NDAA, and thus cannot service as a legal basis for discharge or any other adverse actions against class members; and/or (C) the DoD's categorical ban on religious accommodations to the DoD Mandate violates the RFRA and the Free Exercise Clause rendering Class Members' discharges unlawful.

### B.   The Proposed Classes Satisfy RCFC 23

80.     **Numerosity.** The Rescission Class and the Wrongfully Discharged Class each consist of at least 8,500 service members who have been formally discharged, but is

likely larger when Active-Duty Service Members who have been constructively discharged/involuntarily transferred to the IRR are included.

81.    The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant Agencies' records and centralized computer payroll and personnel systems.

82.    The large class size and geographical dispersion makes joinder impractical, in satisfaction of RCFC 23(a)(1).

83.    **Commonality.** The proposed Rescission Class and alternative Wrongfully Discharged Class each have a well-defined community of interest. The Defendant has acted and failed to act on grounds generally applicable to each Plaintiff and putative Class member, *i.e.*, the imposition of the null and void DoD Mandate and implementing orders or policies based on the now-rescinded mandate, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class.

84.    There are many questions of law and fact common to the claims of Plaintiffs and the proposed Rescission Class and alternative Wrongfully Discharged Class, and those questions predominate over any questions that may affect individual Class members within the meaning of RCFC 23(a)(2) and 23(b)(2).

85.    Common questions of law and fact affecting members of the proposed classes and sub-classes include, but are not limited to, the following:

    a)    **Rescission Class**

    i)    Whether the 2023 NDAA and Section 525 thereof is a "money mandating" statute and providing a substantive right to compensation for Plaintiffs and class members;

    ii)    Whether the rescission of the DoD Mandate should be applied retroactively such that the DoD Mandate is void *ab initio*;  and,

iii)   Whether Section 525 requires Plaintiffs and Rescission Class members to be restored to the *status quo ante* before the imposition of the DoD Mandate and adverse actions taken thereunder.

b)   **Wrongfully Discharged Class**

i)   Whether the Defendants' mandate of unlicensed EUA vaccines was unlawful in violation of 10 U.S.C. § 1107a;

ii)   Whether Defendants' discharge of Plaintiffs and other class members for not accepting injection with an unlicensed, EUA vaccine was unlawful for the purposes of 37 U.S.C. § 204;

iii)   Regardless of whether 2023 NDAA is a money-mandating statute, does Rescission render all discharges unlawful for the purposes of 37 U.S.C. § 204;

iv)   Whether the Defendants' systematic denial of Plaintiff and Class Members' RAR substantially burdened their free exercise of religion;

v)   Whether the Defendants' policy of systematically denying RARs can survive strict scrutiny where the Section 525 Rescission has eliminated any compelling governmental interest for denying religious accommodations; and

iv)   Whether the DoD Mandate was the least restrictive means in light of the fact means that the mandate is no longer a permissible means of further a legitimate governmental interest.

86.   **Typicality.** The claims of Plaintiffs are typical of the claims of all of the other members of the class as required by Rule 23(a)(3), RCFC. The claims of the Plaintiffs and the proposed Rescission Class and alternative Wrongfully Discharged Class are based on the same legal theories and arise from the same unlawful conduct, resulting in the same injury to the Plaintiffs and the Classes.

87.   **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the proposed Rescission Class and alternative Wrongfully Discharged Class. As an opt-in class action, there is no conflict of interest between Plaintiffs and putative class members who choose to opt-in.

88.     The proposed Rescission Class and alternative Wrongfully Discharged Class are each maintainable under Rule 23(b)(3) RCFC as each of the prerequisites to certification under that Rule are met as alleged below.

89.     **Predominance.** Common issues of fact and law predominate over any individual questions or determinations as required by Rule 23(b)(3). The government's liability can be determined on a class-wide basis for the Rescission Class or the Wrongfully Discharged Class based on the answers to the legal questions above.

90.     **Superiority.** A class action is superior to other available methods for fairly and efficiently adjudicating these issues. There are at least 8,500 class members, the vast majority of which have a claim in the range of $10,000 to $100,000 or more. Absent a class action, most members would find the cost of litigating their individual claims to be prohibitive, and they will have no effective and complete remedy.

91.     Calculation of backpay and other compensation will not require individualized determinations. All amounts can be calculated mechanically using a matrix like that set forth in Exhibit 17 ("FY22 Monthly Basic Pay Table") using the payment rates established by law. The amount to which each Plaintiff or class member is entitled to as back pay can be determined from their rank, years in service, and similar criteria to calculate their statutorily defined pay for the period during which they were entitled to pay but were not paid because they were discharged, constructive discharged, and/or separated. Alternatively, the amounts can be calculated by the Defendants in the same manner using the DoD's payroll system and the corresponding personnel records to confirm the period for which they were not paid. The value of lost points can be calculated in a similar manner.

92.     With respect to collateral relief such as correction of individual records, the Court's rulings in the present class action will provide guidance on questions of law and fact on a class-wide basis that the relevant Boards for Corrections of Military Records can apply as appropriate to individual class members' military records.

93.     There are no obstacles that would present heightened difficulties for managing a class action. There is a relatively small number of common questions of law and fact that can produce common answers on a class-wide basis. The backpay and damages calculations do not require individualized determinations and may be calculated mechanically with a matrix like that proposed by Plaintiffs based on statutorily defined pay rates and confirmed using the government's own centralized computerized payroll and personnel systems. Similarly, the identity of class members and best method of providing notice to them can be obtained from the government's own centralized computerized payroll and personnel systems.

94.     While there are many court challenges to the lawfulness of the DoD Mandate seeking injunctive and declaratory relief, as far as Plaintiffs are aware, this is the only class action filed post-Rescission seeking backpay for the class members and the only such action of its kind filed in the Federal Court of Claims.

95.     The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. There are numerous threshold issues of law and fact that the Court can resolve through an adjudication of the Plaintiffs claims that will serve to resolve those same issues present in each class members' claims.  On the other hand, requiring each class member to file an individual claim would likely result in unnecessary, duplicative judicial labor and runs the

risk of inconsistent rulings from the Court. For example, by determining the legal significance of rescission of the DoD Mandate on the propriety of Defendants' refusal to pay Plaintiffs, the Court will necessarily determine the legal significance of that rescission for all class members.

96. Plaintiffs' undersigned counsel are adequate to serve as class counsel under Rule 23(g), RCFC. Plaintiffs' counsel have expended significant time identifying and investigating the claims brought in this action, and collectively, they have substantial experience in prosecuting complex cases, including class actions, military backpay cases, and cases challenging the legality of military vaccine mandates. Specifically, Counsel Dale Saran has significant experience with cases involving military, employment, and vaccine mandate matters, including cases challenging the military's anthrax vaccine mandate. Counsel Brandon Johnson has significant experience litigating class action cases challenging military COVID vaccine mandates, while counsel J. Andrew Meyer has significant experience in representing class members as court-appointed class counsel under Rule 23.

97. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class, appreciate their duty to fairly and adequately represent the interests of class members and are able to faithfully discharge those duties, and have the resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the other Class members.

### FIRST CAUSE OF ACTION [RESCISSION CLASS]
### VIOLATION OF SEC. 525 OF THE FY2023 NDAA

98. Plaintiffs reallege the foregoing paragraphs and facts in Section I as if fully set forth in this count.

99.     The 2023 NDAA Rescission of the DoD Mandate, in conjunction with the 2023 Appropriations Act, are "money mandating" statutes that confer a substantive right to Plaintiffs and Rescission Class members. "Rescind" means "an annulling; avoiding, or making void; abrogation; rescission", while "rescission" means "void in its inception"; or "an undoing of it from the beginning." BLACK'S LAW DICTIONARY at 1306 (6th ed. 1990).

100.    Congress chose this term to direct the Defendant Agencies and the courts to apply the rescission with full retroactive effect to restore Plaintiffs and other Active-Duty Service Members to the position in which they would have been in the absence of the unlawful DoD Mandate and implementation orders.

101.    Secretary Austin's January 10, 2023 Rescission Memo acknowledges this Congressional directive by rescinding the DoD Mandate with limited retroactive effect by committing to correct service members' records and adverse personnel actions. The Rescission Memo and the Armed Services' implementing orders, fail to give retroactive effect to the Rescission for backpay and financial compensation.

102.    Plaintiffs' and Rescission Class members' Tucker Act claims for backpay do not require any showing that the DoD Mandate and implementing orders were unlawful or wrongful or are simply legal nullities (though they are both). Instead, to give full effect to the Rescission requires that Plaintiffs be provided backpay and other requested compensation to which they are entitled as a result of the Rescission of the legal basis for which they were denied payment and to restore the *status quo ante*.

103.    Defendant Agencies' refusal to provide backpay required by the Rescission is the unlawful act in defiance of an express Congressional directive.

104.    Further, failure to provide backpay and other requested compensation would have the effect of creating two classes of Active-Duty Service Members, where some

are made whole through the Rescission, while other similarly situated members receive nothing.

## SECOND CAUSE OF ACTION [WRONGFUL DISCHARGE CLASS]
### VIOLATION OF 37 U.S.C. § 204
### WRONGFUL DISCHARGE IN VIOLATION 10 U.S.C. § 1107A & FY 2023 NDAA

105.    Plaintiffs reallege the foregoing paragraphs and facts in Section I and II as if fully set forth in this count.

106.    Under 37 U.S.C. § 204(a)(1), a service member is "entitled to the basic pay of their …, in accordance with their years of service" if they are "a member of a uniformed service on active duty".

107.    Each Plaintiff and each Active-Duty Service Member was "a member of a uniformed service on active duty" when the DoD Mandate was issued up until the time that they were wrongfully discharged, constructively discharged, separate or involuntarily placed into the IRR.

108.    37 U.S.C. § 204 is a money-mandating statute for all Plaintiff and Class Members who are Active-Duty Service Members and satisfy the foregoing conditions.

109.    Each Plaintiff and Class Member has a claim for Backpay for the full period from that date on which they were wrongfully discharged, constructively discharged, separate or involuntarily placed into the IRR through the end of the term of service during which the discharge occurred and any subsequent terms of reenlistment for which they would have been eligible absent the now rescinded DoD Mandate.

110.    10 U.S.C. § 1107a expressly prohibits the military from mandating any service member to take unlicensed EUA product, absent an express Presidential authorization on the grounds of national security.

111.   There has not been a Presidential authorization to mandate an unlicensed EUA product from the issuance of the DoD Mandate through the present.

112.   The August 24, 2021 DoD Mandate permits only COVID-19 mRNA gene therapy "vaccines" with "full licensure from the [FDA], in accordance with FDA-approved labeling and guidance."

113.   The DoD and other Defendant Agencies mandated gene therapy products that do not meet the DoD's own definition for being vaccines. A "therapy" or "treatment," even if lifesaving, cannot be mandated.[5]

114.   The DoD and other Defendant Agencies have mandated unlicensed EUA COVID-19 vaccines from the issuance of the DoD Mandate on August 24, 2021, until at least the Section 525 Rescission of the DoD Mandate was partially implemented by the DoD on January 10, 2023, the Air Force on January 23, 2023, the Army on January 5, 2023, the Marine Corps on January 18, 2023, and the Navy on January 11, 2023.

115.   No FDA-licensed COVID-19 vaccines were available at all at the time that the DoD Mandate was issued on August 24, 2021.

116.   In related litigation, Defendant Agencies have admitted that they have continuously mandated unlicensed EUA vaccines from the date the mandate was issued and extending through the discharge date of each Plaintiff.

---

[5] *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278, 110 S. Ct. 2841, 2851, 111 L.Ed.2d 224, 242 (1990). The Supreme Court has also recognized that the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. *Washington v. Harper*, 494 U.S. 210, 229, 110 S. Ct. 1028, 1041, 108 L.Ed.2d 178, 203 (1990); *see also Harper*, at 223 (acknowledging in dicta that, outside of the prison context, the right to refuse treatment would be a "fundamental right" subject to strict scrutiny).

117.   Defendant Agencies' consistent and generally applicable policy—as reflected in the September 14, 2021 Pfizer Interchangeability Directive, the May 3, 2022 Moderna Interchangeability Directive, and their litigation position in all related litigation—is that unlicensed EUA COVID-19 vaccines are legally interchangeable with FDA-licensed vaccines and that the unlicensed EUA vaccines should be used "as if" they were the FDA-licensed product for the purposes of the DoD Mandate.

118.   It is undisputed that Defendant Agencies did not have "Comirnaty-labeled" vaccines until at least June 2022 and "Spikevax-labeled vaccines" until at least September 2022.

119.   Military Whistleblowers and filings in related litigation in *Coker v. Austin*, No. 3:21-cv-1211 (N.D. Fla.) and *Bazzrea v. Austin*, No. 3:22-cv-265 (S.D. Tex.) have demonstrated that all doses of "Comirnaty-labeled" vaccines that are not only unlicensed EUA products, but are also misbranded, expired, and/or adulterated. As such these products may not be legally given to anyone, much less mandated, and must be removed from the market and destroyed.

120.   All "Spikevax-labeled" vaccines have expired, as confirmed by Defendant Agencies on January 23, 2023. In related litigation, service members plaintiffs have demonstrated that all "Spikevax-labeled" vaccines expired months ago, a fact confirmed by the January 23, 2023 DHA Notice. *See* Ex. 16.

121.   All Plaintiffs' and Class Members' harms, financial and otherwise, described above are a direct result of the Defendant Agencies' unlawful order mandating an unlicensed EUA product in violation of 10 U.S.C. § 1107a and express requirements of the DoD Mandate that permit only FDA-licensed products to be mandated.

122.     Defendant Agencies' actions are also unlawful in violation of the 2023 NDAA Rescission, which retroactively rendered the DoD Mandate and all other orders based on the DoD Mandate null and void *ab initio*. Among other things, the rescission of the DoD Mandate eliminated any legal basis or authority for the Pfizer and Moderna Interchangeability Directives to treat unlicensed EUA products as legally interchangeable with FDA-licensed products or to use the unlicensed EUA products "as if" they were FDA-licensed products for the purposes of the now-rescinded mandate.

### THIRD CAUSE OF ACTION [WRONGFUL DISCHARGE CLASS]
### VIOLATION OF 37 U.S.C. § 204 & § 206
### WRONGFUL DISCHARGE IN VIOLATION OF 42 U.S.C. § 2000bb

123.     Plaintiffs reallege the paragraphs and facts in Section I and Section III as if fully set forth in this count.

124.     RFRA applies to Defendant Agencies, as they constitute a "branch, department, agency, instrumentality, and official of the United States." 42 U.S.C. § 2000bb-2(1).

125.     RFRA expressly creates a remedy in district court, granting any "person whose religious exercise has been burdened in violation of" RFRA to "assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the government." 42 U.S.C. § 2000bb-1(c).

126.     RFRA states that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).

127.     The DoD Mandate and other challenged Defendant Agency actions substantially burdened the free exercise of religion in violation of RFRA.

128.   The Defendant Agencies each adopted a policy of systematically denying RARs using form letters, without providing the "to the person" individualized determinations required by RFRA, DoDI 1300.17, and the Armed Services' implementing regulations.

129.   The DoD Mandate and other challenged Defendant Agency actions discriminated against religious exercise by treating comparable secular activities, *i.e.*, medical and administrative exemptions, more favorably than comparable religious exercise, *i.e.*, RARs, by granting thousands of medical and administrative exemptions, while granting zero or only a handful (and less than 1%) of RARs.

130.   If the Government substantially burdens a person's exercise of religion, it can do so only if it "demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

131.   Plaintiffs and Wrongfully Discharged Class members have carried their burden of demonstrating that DoD Mandate and other challenged Defendant Agency Actions substantially burdened service members free exercise of religion, shifting the burden to the government to demonstrate that its policy satisfy strict scrutiny with respect "to the person" seeking religious accommodation. *See O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

132.   The Rescission of the DoD Mandate by Congress retroactively removes any compelling governmental interest in compelling vaccination of service members over their religious objections, and retroactively eliminates a 100% vaccination mandate as permissible means, much less the least restrictive means. Accordingly, the Defendant Agencies' policies necessarily fail strict scrutiny.

133.   In addition to backpay, Plaintiffs and Wrongfully Discharged Class Members may seek monetary damages for wrongful discharges due to RFRA violations. *See Klingenschmitt v. U.S.*, 119 Fed.Cl. 163 (Ct.Cl.2014).

**FOURTH CAUSE OF ACTION**
**VIOLATION OF 10 U.S.C. § 1552**

134.   Plaintiffs reallege the foregoing paragraphs and facts as if fully set forth in this count.

135.   Plaintiffs seek an order from the Court directing the appropriate BCMR to correct their military records and remove any adverse paperwork resulting from their unvaccinated status or failure to comply with the rescinded and/or unlawful DoD Mandate.

136.   For any Plaintiffs or putative Class members who may have been denied promotion, removed from promotion selection lists, or not selected due to adverse actions or loss of points due to non-compliance with the rescinded and unlawful DoD Mandate, Plaintiffs request that the Court direct these matters to the appropriate BCMRs or appropriate Special Selection Boards.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs pray that this Court:

137.   Certify either the Recission Class or the Wrongfully Discharged Class under Federal Court of Claims Rule 23 as those respective Classes are defined in this Complaint;

138.   Appoint Plaintiffs as the representatives of the class certified by the Court;

139.   Appoint undersigned Counsel as counsel for the class certified by the Court;

140.   Direct that appropriate notice be given to Class Members in order to allow Class Members to opt-in as required by Federal Court of Claims Rule 23;

141.   Award and enter a judgment for at least $650,000 due in military backpay for the Plaintiffs and in an amount to be determined for a common fund for all members of the Class who opt in to the Class;

142.   Award Plaintiffs and Class Members the above monetary judgment, plus interest, costs, and attorney's fees, as a result of the improper actions of the Defendant and his agents;

143.   Reinstate and correct the military records of Plaintiffs and Class Members as requested herein; and

144.   Grant such other relief as the Court may deem just and proper to provide Plaintiff and Class Members "full and fitting relief."


Date:  February 13, 2023                    Respectfully submitted,

                                            */s/ Dale Saran*
                                            Dale Saran, Esq.
                                            19744 W 116th Terrace
                                            Olathe, KS 66061
                                            Telephone: 480-466-0369
                                            E-mail: dalesaran@gmail.com

                                            */s/ Brandon Johnson*
                                            Brandon Johnson, Esq.
                                            DC Bar No. 491370
                                            Defending the Republic
                                            2911 Turtle Creek Blvd.,
                                            Suite 300 Dallas, TX 75219
                                            Tel. 214-707-1775
                                            Email: bcj@defendingtherepublic.org
                                            (PHV Motion Pending)

                                            */s/ J. Andrew Meyer*
                                            J. Andrew Meyer, Esq.
                                            FL Bar No. 0056766
                                            FINN LAW GROUP, P.A.
                                            8380 Bay Pines Blvd.,
                                            St. Petersburg, FL 33709

Tel. 727-709-7668
Email: ameyer@finnlawgroup.com
(PHV Motion Pending)

*Attorneys for the Plaintiffs*